UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
**ALEJANDRO GONZALEZ, RACIEL**
**HERNANDEZ, CARLOS ORTEGA,**
**GERARDO ROJAS, JOSE SANTANA,**
**JOSE RANULFO URRUTIA, and**
**WORLD TRADE CAPITAL MARKET S.C.,**

                **Plaintiffs,**

    -against-                                             **04 Civ. 3762 (RCC)**

**AXESS TRADE CO., INC. and SABY ABUAF,**

                **Defendants.**
------------------------------------------------------------X
**U.S. COMMODITY FUTURES TRADING**
**COMMISSION,**

                **Plaintiff,**

    -against-                                             **04 Civ. 4293 (RCC)**

**AXESS TRADE CO., INC.,**                           **MEMORANDUM & ORDER**

                **Defendant.**
------------------------------------------------------------X

**Richard Conway Casey, United States District Judge:**

These two related cases involve Defendant Axess Trade Co.'s uncontestedly fraudulent activities in foreign currency exchange futures ("Forex") contracts. A group of six individual investors ("Individual Investors") and a trading firm named World Trade Capital Market S.C. ("WTCM") (together, "Private Plaintiffs") sued Axess Trade and its principal Saby Abuaf ("Private Action"). Apparently learning of Axess Trade's activities through the Private Action, the United States Commodity Futures Trading Commission ("CFTC") brought its own action against Axess Trade pursuant to 7 U.S.C. § 13a-1 ("CFTC Action"), which was assigned to this Court as a related

case. Axess Trade has approximately $69,000 in assets in the United States, which are frozen as the result of a preliminary injunction that this Court issued. The Private Plaintiffs and the CFTC are contesting to whom those limited assets should be distributed. As explained below, the Court holds that the Private Plaintiffs are entitled to a preference in the distribution of funds but not to all of the funds. The Court modifies the preliminary injunction accordingly.

**I.     BACKGROUND**

WTCM is incorporated under the laws of Mexico, and the Individual Investors are Mexican citizens. WTCM learned of Axess Trade, a Panamanian corporation, during its search for a new clearing firm to handle its customers' foreign-currency trades. The Private Plaintiffs allege that Axess Trade, through Abuaf, fraudulently induced the Individual Investors to open Internet Forex trading accounts with Axess Trade and induced WTCM to act as an introducing broker for Axess Trade. When representatives of WTCM met with Abuaf in Manhattan and Mexico City to discuss Axess Trade's services, Abuaf claimed that Axess Trade was registered with the U.S. Commodity Futures Trading Commission ("CFTC") as a futures commission merchant and that Axess Trade had offices New York City. WTCM referred the Individual Investors to Axess Trade in exchange for commissions on the Individual Investors' trades. The Individual Investors set up Internet accounts and deposited funds in those accounts by wiring money to Axess Trade's bank account at JPMorgan Bank in New York City.

The Private Plaintiffs allege that hundreds of profitable trades of U.S. dollars against Mexican pesos that the Individual Investors made in their accounts were retroactively "canceled" by Axess Trade, depriving them of the profits from those trades. Axess Trade also allegedly

misappropriated $20,000 from the accounts of WTCM's clients.[1] And Axess Trade's New York offices turned out to be bogus. One address that was provided is, according to the Private Plaintiffs' counsel, a Mail Boxes Etc. store. The other office in the Empire State Building actually belongs to Capital Management Services LLC, the services of which Axess Trade allegedly used to clear the Individual Investors' trades and with which Axess Trade maintained its own account.

The Private Plaintiffs brought suit under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et sq., and New York State law. The Individual Investors claim compensatory damages of $223,610.37 for lost profits plus an unspecified sum of misappropriated funds. WTCM claims to have lost $122,844.52 in commissions when Axess Trade retroactively canceled the Individual Investors' trades. The Private Plaintiffs also seek treble damages under RICO.

On May 19, 2004, the Court issued an order of attachment on the motion of the Private Plaintiffs, resulting in the attachment of $69,022.27 held in two accounts by Axess Trade in New York. The Court confirmed that order of attachment, as is required under New York law, N.Y. C.P.L.R. 6211(b), on June 15, 2004. The Private Plaintiffs posted an undertaking of $10,000 to obtain the order of attachment.

The CFTC Action commenced on June 7, 2004. The CFTC alleged that Axess Trade violated three provisions of the Commodity Exchange Act ("CEA"), 7 U.S.C. §§ 6(a), 6b(a)(i) and (iii), and CFTC regulations, 17 C.F.R. § 1.1(b)(1) and (3). Axess Trade allegedly engaged in illegal off-exchange futures contracts because the contracts were not made on or subject to the rules of a

---

[1] It is not clear how much of this $20,000 is traceable to the Individual Investors because WTCM introduced twelve clients to Axess Trade, only six of whom are among the Private Plaintiffs.

board of trade registered with or designated by the CFTC. Axess Trade also engaged in fraudulent misrepresentation, by among other things, falsely stating that it was registered with the CFTC. On September 24, 2004, the Court issued a consent order in the CFTC Action that preliminarily enjoined Axess Trade from, among other things, encumbering, transferring, and selling its assets located in the United States. The injunction also required Axess Trade to provide a full accounting to the CFTC of its clients and assets. The CFTC has endeavored to determine how many clients Axess Trade defrauded. Axess Trade provided the accounting, and the CFTC has learned that a second group of investors who were introduced by a broker called Interglobal Capital S.A. de C.V. ("Interglobal") were defrauded, all of whom, like the Private Plaintiffs, are foreign citizens.

After that consent order was issued, the Private Plaintiffs, Axess Trade, and Abuaf (who is not a defendant in the CFTC Action), agreed to a settlement under which the frozen assets would be distributed as follows: Private Plaintiffs would receive $68,021.00, of which $1,000.00 would be paid as attorney's fees to the defendants' attorney. The parties submitted this agreement to the Court for approval because it conflicted with the injunction in the CFTC Action prohibiting the transfer of Axess Trade's assets held in the United States. The proposed settlement would exceed the Private Plaintiffs' total out-of-pocket losses—that is, the losses sustained from Axess Trade's misappropriation of the Individual Investors' investments.

The CFTC objected to the proposed settlement because the effect would be to dissipate all of Axess Trade's known assets in the United States and therefore leave the Interglobal victims without compensation. Axess Trade and Abuaf, who have never contested their liability in these actions and are apparently out of business, favor the Private Plaintiffs' settlement because it would provide an expedient end to this litigation. Thus, the Court considers the current application as a

joint motion to modify the preliminary injunction in the CFTC Action. Both Axess Trade as a defendant in the CFTC Action and the Private Plaintiffs ask the Court to modify the preliminary injunction thereby allowing the settlement in the Private Action. Ultimately, the question before the Court is how to most equitably distribute a limited fund. The CFTC argues for pro rata distribution, but the Private Plaintiffs maintain that they are exclusively entitled to the funds.

## II. DISCUSSION

### A. The CFTC Has Regulatory Jurisdiction Here

As an initial matter, the Private Plaintiffs object to the CFTC's interference with the proposed settlement agreement because they claim that the CFTC lacks regulatory jurisdiction over Axess Trade's activities. That is so, the Private Plaintiffs say, because the transactions giving rise to both cases are specifically exempted from the CFTC's purview by the CEA. The Court disagrees.

The CFTC is an independent regulatory agency with broad powers over futures trading and commodities exchanges. Fed. Trade Comm'n v. Ken Roberts Co., 276 F.3d 583, 588 (D.C. Cir. 2001). In 1997, the Supreme Court held that the CFTC's regulatory jurisdiction did not extend to off-exchange transactions in options to buy or sell foreign currency. See Dunn v. CFTC, 519 U.S. 465, 469-70 (1997). In 2000, Congress passed the Commodity Futures Modernization Act ("2000 Amendment"), giving the CFTC jurisdiction over futures in foreign currency. See CFTC v. Zelener, 373 F.3d 861, 862 (7th Cir. 2004). The 2000 Amendment provides jurisdiction to the CFTC over "an agreement, contract, or transaction in foreign currency . . . that is offered to, or entered into with, a person who is not an eligible contract participant." 7 U.S.C. § 2(c)(2)(b)(ii). The victims here are not "eligible contract participants," and the Private Plaintiffs do not argue that they are. See id. § 1a(12) (defining "eligible contract participant").

It is not contested that the transactions at issue here are agreements, contracts, or transactions in foreign currency within the meaning of the 2000 Amendment. Instead, the Private Plaintiffs argue that the transactions are exempt from CFTC regulatory jurisdiction because they are contracts made on or subject to the rules of a board of trade, exchange or market located outside the United States. The CEA does limit the CFTC's authority to require futures trading to be performed on a board of trade designated or registered by the CFTC if the contracts in question are "made on or subject to the rules of a board of trade, exchange, or market located outside the United States." Id. § 6(a). Both complaints allege, however, that the transactions at issue were off-exchange, in that they were not made on any organized exchange or market. The Private Plaintiffs appear to maintain that the transactions occurred on the international (and unregulated) Forex market and thus were outside the CFTC's jurisdiction. The Private Plaintiffs view Congress's use of the term "market" to mean the marketplace, or the open market. That definition is inconsistent with use of the term in the CEA.

Although the CEA does not define the term "market," its use in the same sentence as "board of trade," which is defined as "any organized exchange or other trading facility," id. § 1a(2), suggests that the open market is not what Congress had in mind. The term "market," preceded as it is by the phrase "made on or subject to the rules of," means an organized market similar to a board of trade or exchange that has defined rules. One would not enter into a contract "on or subject to the rules of" the open market; indeed, a market is open when it is unregulated and therefore without formally adopted rules. The Private Plaintiffs argument is that Congress would not have wanted to subject transactions in the unregulated international marketplace to a U.S. regulatory agency. But if the exception to the requirement that transactions or contracts covered by the CEA be on CFTC-designated boards of trade includes only those contracts subject to rules of a foreign board of trade

6

or something similar, then the international Forex market does not qualify.

The Private Plaintiffs qualify their textually based argument to maintain that the CEA limits the CFTC's enforcement authority to transactions having some relationship to the United States. Whether or not this argument follows from the specific statutory provisions that the Private Plaintiffs cite, it is easily rejected because the transactions here did have substantial connections to the United States. This issue, normally raised in the context of a court's subject-matter jurisdiction, is one of extraterritoriality.

In determining whether the CEA applies to actions taken abroad, the Second Circuit has asserted that the question is tantamount to "whether Congress would have wished the precious resources of the United States courts and law enforcement agencies to be devoted to [the transactions at issue] rather than leave the problem to foreign countries." See Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1044-45 (2d Cir. 1983) (internal quotation marks omitted). Here, the answer is yes. It is uncontested that representatives of WTCM and Axess Trade met in Manhattan to discuss potential business relations, at which meeting Abuaf misrepresented that Axess Trade was registered with the CFTC. Additionally, the Private Plaintiffs conducted the trades by wiring funds to a New York bank account, some of which Axess Trade misappropriated. Both actions were essential to Axess Trade's fraudulent scheme. Thus, the transactions satisfy the "conduct test" applied in Psimenos because Axess Trade conducted substantial activities in furtherance of its fraudulent scheme in the United States that directly caused the victims' losses. See id. at 1048. Therefore, the fact that the victims here are all foreign nationals does not erect a barrier to the prosecution of the CFTC Action or to the CFTC's objection to modification of the preliminary injunction.

Neither the CEA nor limitations on the extraterritorial scope of congressional legislation

prevents the CFTC's regulatory jurisdiction, and hence its interest in maintaining the preliminary injunction. Therefore, the Court must address the propriety of amending the preliminary injunction to permit some of the frozen assets to be distributed to the Private Plaintiffs.

> **B.   The Private Plaintiffs Are Entitled To A Preference In Distribution Under Principles Of Equity**

The Court has discretion to modify a preliminary injunction that it issued because injunctions are executory and subject to change as needed. See Sierra Club v. U.S. Army Corps of Eng'rs, 732 F.2d 253, 256 (2d Cir. 1984). "When modifying a preliminary injunction, a court is charged with the exercise of the same discretion it exercised in granting or denying injunctive relief in the first place." Id. The preliminary injunction here was not issued under Federal Rule of Civil Procedure 65(a), but under statutory authority provided in the CEA. See 7 U.S.C. § 13a-1(b). The Court, however, is also vested with equitable discretion over statutory injunctions. CFTC v. British Am. Commodity Options Corp., 560 F.2d 135, 141 (2d Cir. 1977). And the fact that the preliminary injunction was entered on Axess Trade's consent is also no barrier to its modification. See Sys. Fed'n No. 91 v. Wright, 364 U.S. 642, 646 (1961) ("'We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions though it was entered by consent.'" (quoting United States v. Swift & Co., 286 U.S. 106, 114 (1932))). Here, the change in circumstances—the proposed settlement—convinces the Court that it would inequitable to allow the preliminary freeze on Axess Trade's assets to continue as imposed.

The CFTC's position is that the Private Plaintiffs—who have assumed the risk of seeking and retaining counsel in the United States, availed themselves of the protection of a U.S. court, and expended considerable resources over the last year in locating and attaching Axess Trade's

8

assets—should be treated no different than the other investors who have borne none of those burdens. Despite the Court's repeated efforts to obtain an explanation for this position, the CFTC has done little but invoke the name of equity. But principles of equity favor a preference for the Private Plaintiffs.

First, the Private Plaintiffs deserve preference in distribution because their suit alerted the CFTC to Axess Trade's malfeasance and aided the CFTC in locating Axess Trade's assets in the United States. Second, the other victims have never appeared in either proceeding and, according to the CFTC, have not even approached the agency about their losses. Indeed, the CFTC learned the identities of the other victims from Axess Trade itself. Finally, and most important, the Private Plaintiffs have expended considerable time, effort, and monetary resources in pursuing their suit. The Private Plaintiffs' counsel located Axess Trade's assets in the United States and sought their attachment, and the Private Plaintiffs were required to post an undertaking of $10,000 to obtain the attachment. They, unlike the other victims, have paid or will have to pay attorney's fees and court costs to litigate this matter. The Private Plaintiffs are therefore entitled to a preference in the distribution of the fund over the other victims.

The CFTC, in arguing against this result, notes the proposition that "[c]ourts have generally favored pro rata distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders." SEC v. Credit Bancorp, Ltd., 290 F.3d 80, 88-89 (2d Cir. 2002). But that proposition has softened impact when some victims expend their own resources and are responsible for bringing a defendant's wrongdoing to light. Congress has recognized, for example, that private parties who bring actions that alert the government to false claims should receive compensation for their efforts.

9

See False Claims Act, 31 U.S.C. § 3730(d). And courts have long recognized in the class-action setting an equitable principle that those whose efforts provide gain to others should be rewarded through the payment of attorney's fees and costs. See, e.g., Boeing Co. v. Van Gemert, 444 U.S. 472, 478 (1980). In Boeing Co., the Supreme Court explained that the common-fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." Id. Thus, equity does not demand strict pro rata distribution here. The Private Plaintiffs are entitled to a preference in the distribution of the frozen assets.

### C. That Preference Does Not Include Lost Profits Or WTCM's Commissions

Although the Court finds that equitable principles weigh in favor of compensating the Private Plaintiffs for their losses, attorney's fees, and costs over the other victims' losses, that preference only includes damages for out-of-pocket losses. The Private Action also seeks statutory damages, recovery of the Individual Investors' lost profits, and WTCM's lost commissions. But to compensate the Private Plaintiffs for losses that were sustained only on paper before the other victims receive any money for out-of-pocket losses due to Axess Trade's fraudulent scheme would be to carry the principle that those who bear the burden of litigation should first benefit from its fruits too far. It is uncontested that the damages sought in the Private Action are well in excess of Axess Trade's frozen assets. The Court views it as inequitable to award statutory damages or lost profits to the Private Plaintiffs before the other victims recovered their funds misappropriated. Similarly, WTCM's commissions do not deserve preference over the Interglobal victims' lost investments. Finally, the Court sees no reason to award attorney's fees to counsel for Axess Trade and Abuaf, whose efforts did not contribute to the victims' recovery. Therefore, the preference in distribution

shall apply to the Individual Investors' out-of-pocket losses only and their costs and attorney's fees. Because the amount that Axess Trade misappropriated is not clear from the record, the Private Plaintiffs shall provide documentation as to that amount and as to the attorney's fees and costs incurred as a result of the Private Action. Of course, the Court will only allow the payment of reasonable attorney's fees and, in awarding fees, will take into account the limited funds available.

### III. CONCLUSION

For the foregoing reasons, the Court modifies the preliminary injunction in the CFTC Action to permit distribution of some of the assets to the Private Plaintiffs. The Private Plaintiffs shall submit documentation of their actual, out-of-pocket losses resulting from Axess Trade's fraudulent scheme. Those losses shall be compensated first, followed by the Private Plaintiffs' reasonable attorney's fees and costs to be approved by the Court. Once those distributions are made, the victims who were clients of Interglobal shall receive <u>pro rata</u> compensation for their actual losses. Accordingly, the Private Plaintiffs are to submit documentation of their out-of-pocket losses, attorney's fees, and costs by July 8, 2005.

**June 9, 2005**
**New York, NY**

                                      **SO ORDERED.**

                                      */s/ Richard Conway Casey*

                                      **Richard Conway Casey, U.S.D.J.**